**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE: | : CIVIL ACTION |
|  | : |
|  | : |
| SAFEGUARD SCIENTIFICS | : 01-3208 |
|  | : |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO STRIKE AND PRECLUDE TESTIMONY
OF PLAINTIFFS' EXPERT, R. ALAN MILLER, AND FOR COSTS**

Nothing plaintiffs say can cure the three fatal deficiencies with Mr. Miller's new

report. Any one of these deficiencies would require the granting of defendants' Motion to Strike.

First, the new report is late. Under the Court's Scheduling Order, plaintiffs were

required to disclose all expert reports by March 19, 2004, i.e., four-and-a-half months before

plaintiffs filed the new report. Plaintiffs' varied and inconsistent attempts to excuse their late

filing all fail. The new report is not a proper rebuttal report; it is not a proper supplemental

report; and it is not a proper summary judgment affidavit. It is simply an out-of-time report,

desperately designed to try to stave off summary judgment. For this reason, it should be

stricken.

Second, the new report contradicts Mr. Miller's prior testimony. In his original

report, Mr. Miller claimed not to have calculated the impact of the alleged manipulative trading.

Now, he says that he did. In his original report, Mr. Miller relied upon three alleged corrective

disclosures. Now he relies upon five. Although plaintiffs try to confuse the issue by jumping

between their differing claims and Mr. Miller's ever-shifting opinions, merely comparing the

plain language of Mr. Miller's old and new reports reveals that they are inconsistent.  For this additional independent reason, the new report should be stricken.

Third, the new report does not meet even the most basic legal standards for expert testimony.  Mr. Miller's market manipulation opinions are deficient because they lack any scientific methodology at all.  Similarly, Mr. Miller's opinions regarding the non-disclosure claim are deficient because he did not control for influences unrelated to the alleged fraud on Safeguard's stock price.  That is, he did not perform a scientifically valid event study.  Significantly, plaintiffs do not even try to defend Mr. Miller's conclusory market manipulation opinions.  And, with regard to their non-disclosure claim, plaintiffs first try to ignore the cases holding that an expert must perform certain analytical steps to satisfy Daubert.  Later, they change course and pretend that Mr. Miller did perform those steps, when he did not.  The fact is that Mr. Miller did not satisfy even the simplest tests for establishing scientific validity.  For this final, independent reason, the new report should be stricken.

## I.     NO MATTER HOW HARD PLAINTIFFS TRY TO CONFUSE THE ISSUES, MR. MILLER'S NEW REPORT IS UNTIMELY.

The facts regarding the timeliness of Mr. Miller's new report are undisputed. Under the Court's Scheduling Orders, plaintiffs were required to serve all expert reports by March 19, 2004 and expert discovery was to close on July 9, 2004.  Plaintiffs served Mr. Miller's new report on August 30, 2004 -- four-and-a-half months late.

Despite these undisputed facts, plaintiffs claim that the new report is proper. Depending upon the particular point they are trying to make, plaintiffs claim that the new report is proper because it serves as a "rebuttal" report.  See Pls.' Brf. at 2, 14.  Or, because it merely

supplements and clarifies Mr. Miller's earlier testimony.  See id. at 1, 5, 6, 8, 9.  Or, because it is

a proper affidavit under Rule 56(e).  See id. at 2.  But none of plaintiffs' inconsistent

explanations excuses their failure to provide complete and final expert reports prior to the

Court's deadline.


### A. Mr. Miller's New Report Is Not a Rebuttal Report.

Without citing any legal authority, plaintiffs cavalierly claim that the new report

is a proper rebuttal to defendants' arguments.  Plaintiffs are wrong.

Rule 26(a)(2)(C) governs rebuttal expert reports.  It provides in pertinent part:  "In

the absence of other directions from the court or stipulation by the parties, … the evidence …

intended solely to contradict or rebut evidence on the same subject matter identified by another

party under paragraph 2(B), [shall be made] within 30 days after the disclosure made by the

other party."  Fed. R. Civ. P. 26(a)(2)(C).  Thus, where there are "no directions from the court,"

parties have 30 days after the other side has disclosed its experts to file a rebuttal report.

Here, there were very specific "directions from the court."  The Court entered

Scheduling Orders which required plaintiffs to serve their expert reports by March 19, 2004 and

did not allow for rebuttal reports.  Thus, any rebuttal report is improper.  See Aveka L.L.C. v.

Mizuno Corp., 212 F.R.D. 306, 310 (M.D.N.C. 2002) (striking expert report where discovery

plan did not provide for rebuttal reports); IBM Corp. v. Fasco Indus., Inc., CIV. A. No. 93-

20326, 1995 WL 115421, *2 (N.D. Cal. Mar. 15, 1995) (striking expert reports and explaining

that where scheduling plan is silent regarding rebuttal reports, such report are not permitted).

Even if this Court had not entered a discovery plan, Mr. Miller's new report still would be improper. Under Rule 26(a)(2)(C), rebuttal reports are due 30 days after the other side has disclosed its experts. Here, Mr. Miller's new report was filed four months after defendants served Dr. Jarrell's report on April 29, 2004. Thus, Mr. Miller's new report was untimely and should be stricken. <u>See, e.g.</u>, <u>Keener v. U.S.</u>, 181 F.R.D. 639, 641-42 (D. Mont. 1998) (striking rebuttal report that was not filed 30 days after the other side had served its expert report).

**B.      The New Report Is Not a Valid Supplemental Report.**

Mr. Miller's new report is also not a valid "supplemental report" under Rule 26(e). At best, the new report plugs holes in his prior report; at worst, it flatly contradicts his prior testimony. Either way, it is improper.

The case of <u>Stein v. Foamex International</u>, CIV. A. No. 00-2356, 2001 WL 936566 (E.D. Pa. Aug. 15, 2001), is right on point. In <u>Stein</u>, the plaintiff filed an expert affidavit that was designed to address arguments raised in the defendants' summary judgment motion. In response to the defendants' motion to strike, the plaintiff claimed that the new affidavit was a proper supplemental report. The court rejected the plaintiff's argument and struck the affidavit, explaining: "In essence, Stein would have the Court allow him to file preliminary expert reports and then freely supplement them with information and opinions that should have been disclosed in the initial report. That result would effectively circumvent the requirement for disclosure of a timely and complete expert report." <u>Id.</u> at *6. <u>See also</u> <u>MRO Comm., Inc. v. AT&T</u>, 205 F.3d 1351, 1999 WL 1178964, *6 (9th Cir. 1999) (permitting late expert reports would create a "loophole through which a party who submits partial expert witness disclosures can add to them to its advantage after the court's deadline for doing so has passed").

Similarly, in <u>Aveka</u> -- cited by defendants in their opening memorandum but ignored by plaintiffs -- the court struck an untimely expert opinion, explaining:

> Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading. **It does not cover failures of omission because the expert did an inadequate or incomplete preparation.** To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would reek havoc in docket control and amount to unlimited expert opinion preparation.

<u>Aveka L.L.C.</u>, 212 F.R.D. at 310 (citations omitted) (emphasis added). <u>See</u> <u>also</u> <u>Keener</u>, 181 F.R.D. at 640 (striking expert's second report and explaining that "[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information <u>that was not available at the time</u> of the initial disclosure") (emphasis added).

Here, as in <u>Stein</u> and <u>Aveka</u>, plaintiffs do not claim that the new report was needed to correct inaccuracies in Mr. Miller's earlier report. Nor do they claim that the new report reflects "information that was not available at the time of the initial disclosure." <u>Keener</u>, 181 F.R.D. at 640. Thus, the new report is not a supplemental report and should be stricken.

### C.   The New Report Is Not a Valid Rule 56(e) Affidavit.

Plaintiffs also argue that the new report is a proper Rule 56(e) affidavit. <u>See</u> Pls.' Brf. at 2. Again, they are wrong.

The plaintiff in <u>Stein</u> also sought refuge under Rule 56(e)'s provisions. Yet, the court, seeing through the obvious pretext, held that permitting such tactics would unfairly "allow litigants the opportunity to 'mold their expert reports to meet [their opponent's] legal challenges.'" <u>Stein</u>, 2001 WL 963566 at *6 (quoting <u>In re TMI Litig.</u>, 922 F. Supp. 997, 1005 n. 10 (M.D. Pa. 1996)) (modification in original). Other courts have reached similar conclusions.

See, e.g., Jones v. PPG Indus., Inc., 73 Fed. Appx. 706 (5th Cir. 2003) (striking untimely expert report submitted in opposition to summary judgment); Carson Harbor Village, Ltd. v. Unocal Corp., CIV A. No. 96-3281, 2003 WL 22038700 (C.D. Cal. Aug. 8, 2003) (same); Baker v. Indian Prairie Cmty., Unit, CIV.A. No. 96-C-3927, 1999 WL 988799, *3 (N.D. Ill. Oct. 27, 1999) ("The Court will not allow [plaintiffs] to ambush Defendants with new expert opinions after the expert disclosure deadline and after they filed for summary judgment").

Here, as in Stein, Mr. Miller's new report "was filed in response to the defendants' Motion for . . . Summary Judgment, and was carefully tailored, by [plaintiffs'] counsel, to dovetail with the statutory requirements the Defendants claimed [plaintiff] had failed to prove." Stein, 2001 WL 936566 at *6. Thus, it should be stricken.[1]

## II. PLAINTIFFS' ATTEMPTS TO EXPLAIN AWAY THE CONTRADICTIONS IN MR. MILLER'S OPINIONS ALL FAIL.

Faced with incontrovertible proof that Mr. Miller has offered new opinions that flatly contradict his old opinions, plaintiffs resort to obfuscation. In their desperate attempt to confuse the issues and mask their blatant violations of this Court's Scheduling Orders, plaintiffs submit a brief that is nearly impossible to decipher: Plaintiffs confuse their two claims -- market manipulation and non-disclosure; they distort beyond recognition the plain record of Mr. Miller's

---

[1]     Plaintiffs further seek to excuse their late filing by claiming that it causes no prejudice to defendants. They argue that defendants could have sought to "redepose" Mr. Miller or submitted an additional affidavit by Dr. Jarrell. See Pls.' Brf. at 11. Plaintiffs still don't get it. As the Court recognized in its ruling on the untimely motion for intervention, "nearly three years have elapsed since [this case's] inception, [fact] discovery has closed and the matter is now trial ready." In Re Safeguard Scientifics, 220 F.R.D. at 49. Thus, requiring additional depositions and affidavits would cause "prejudice to the defendants, particularly in terms of additional attorneys' fees and legal expenses." Id. at 47.

prior report, deposition testimony, and new report; and, when all else fails, they try to blame defendants' counsel for failing to ask proper deposition questions.

   This just is not as complicated as plaintiffs pretend. Mr. Miller's first report said one thing. His second report says something different. It's as simple as that. Despite plaintiffs' best efforts to obscure the truth, the submission of Mr. Miller's new, contradictory report at this stage of the litigation is wholly indefensible.

### A.  Mr. Miller's Testimony On Market Impact Is Inconsistent.

   Plaintiffs have asserted two theories in this case. They allege, first, that defendants failed to disclose information regarding, among other things, Mr. Musser's margin trading and the related loan and guarantee. This is plaintiffs' non-disclosure claim. Plaintiffs also allege a market manipulation theory. Under this theory, plaintiffs claim that they were injured by defendants' purchases of eMerge stock.

   Market impact has been an element of plaintiffs' market manipulation claim since the first day of this litigation three years ago. That is, to recover under their market manipulation theory, plaintiffs must show that they as *Safeguard* shareholders were harmed by the allegedly manipulative *eMerge* stock purchases. This requires proof, first, that the purchases artificially inflated eMerge's stock price; second, that the inflation in eMerge's stock price caused Safeguard's stock price to be artificially inflated; and, third, that Safeguard's stock price was inflated on days when plaintiffs purchased Safeguard stock.

   Notwithstanding the fact that market impact was an obvious area for potential expert testimony, Mr. Miller did not initially opine on any of the market manipulation issues. He

offered <u>no</u> opinion that the eMerge stock purchases caused artificial inflation in eMerge's stock price; he offered <u>no</u> opinion that such alleged inflation caused Safeguard's stock price to be inflated; and he offered <u>no</u> opinion (and still offers <u>no</u> opinion) as to whether such inflation occurred on any day when plaintiffs actually purchased their stock.  To the contrary, Mr. Miller unequivocally stated in his February 6, 2004 Report that:  "We have not yet separately calculated the effect of the undisclosed eMerge purchases by Musser and associated entities on eMerge and/or Safeguard's stock prices . . . ."  Miller Rpt. ¶13.  And, he confirmed 21 weeks later, at his June 29, 2004 deposition, that he still had not calculated any such effect.  Miller Dep. Tr. at 208-209.

Now, having seen defendants' summary judgment motion, Mr. Miller has changed his tune.  He writes in his August 30, 2004 report that "we did, indeed, analyze the impact of trading in eMerge stock by Musser, Grinker, Safeguard, and the Foundation prior to Plaintiffs' submission of the Answer to Interrogatories [<u>i.e.</u>, **before** the submission of his first report].  We concluded there was considerable market impact. . . ."  Miller Decl. ¶16.

Faced with this glaring inconsistency, plaintiffs try to fog the issue.  Rather than addressing market impact, <u>i.e.</u>, an element of their <u>market manipulation claim</u>, they focus upon Mr. Miller's testimony that he had assumed that the allegedly manipulative trades should have been disclosed for purposes of their <u>non-disclosure claim</u>.  But Mr. Miller's own report makes clear that these are distinct issues which he treated differently:

> We have not yet separately calculated the effect of the undisclosed eMerge purchases by Musser and associated entities on eMerge and/or Safeguard's stock prices, although the **non-disclosure** of these purchases is included in the damages presented below.

Miller Rpt. ¶13 (emphasis added).  As Mr. Miller confirmed at his deposition:

Q: In your report at paragraph 13, you indicate, Mr. Miller, that you have not yet separately calculated the effect of the undisclosed eMerge purchases by Musser and associated entities on eMerge and/or Safeguard's stock prices.  Does that remain true as of the current date?

A: **Yes**.

Q: So at this juncture, regardless of the intent of the parties making those purchases, you have not formulated an analysis as to whether or not those purchases had an impact on the stock price of either eMerge or Safeguard?

A: **As a separate item, that's correct.**  But the rest of that sentence is also true, that is, the non-disclosure of the purchases is included in the damages, by that I mean the difference between the actual stock price and our true value line.  So, what I meant in the first half of that sentence is that **we have not separately calculated the effect of the trading effect . . . of those purchases on the price and volume result in the stock**, as separated from the disclosure of the trading and its purposes as outlined in the Interrogatory Answer as a component of damages which we have included it for.

Miller Dep. Tr. at 208-210 (emphasis added).

  Having confused Mr. Miller's testimony regarding their two separate claims, plaintiffs then turn around and accuse defendants of confusing the issues of loss causation and damages.  Defendants did no such thing.  Rather, it is plaintiffs who, once again, are trying to muddy the waters.

  Plaintiffs claim that Mr. Miller "concluded, at paragraph 26 of the [initial] Report, that defendants' alleged manipulative activities . . . satisfied loss causation standards." Pls.' Brf. at 5.  Mr. Miller offered no such opinion.  Rather, his sole loss causation opinion related to the non-disclosure claim.  Specifically, in paragraph 26, Mr. Miller meekly stated that "It **appears** that the decline in the actual stock prices for Safeguard which occurred after the **relevant disclosures** were substantially related to the issues raised in the Complaint."  Miller Rpt. ¶26

(emphasis added). Mr. Miller identified the "relevant disclosures" as having occurred on December 18, 2000, February 9, 2001, and February 20, 2001 -- months after the alleged manipulative purchases of eMerge stock. See Miller Rpt. ¶14. Given this timing difference and Mr. Miller's concession that he had not calculated the effect of the allegedly manipulative trades on Safeguard's stock price, it is clear that Paragraph 26 does not refer to those trades. In fact, in that same paragraph, Mr. Miller wrote that plaintiffs' alleged "purchase of shares at inflated prices . . . was caused by the **omissions and misstatements described in the Complaint**" -- not by any alleged market manipulation. Id. at ¶ 26 (emphasis added).

Unable to point to any language in Mr. Miller's initial report dealing with the issue of market impact, plaintiffs blame defendants' counsel for supposedly not having asked enough questions about market impact. Plaintiffs are wrong. First, as demonstrated above, defendants asked specific questions regarding the exact issue of market impact. Miller Dep. Tr. at 208-210. In fact, towards the end of the deposition, counsel for defendant Musser sought to confirm that Mr. Miller had not performed any analysis of market impact. Rather than permitting Mr. Miller simply to answer the questions, plaintiffs' counsel objected to the questions, claiming that they had already been "asked and answered" and that defendant's counsel was "harassing" Mr. Miller. See Miller Dep. Tr. at 338-340.

In any event, defendants were under no obligation to ask a single deposition question of Mr. Miller. Rule 26(a)(2)(B) requires that an expert's report "contain a complete statement of all opinions to be expressed and the basis and reasons therefor ...." Fed. R. Civ. P. 26(a)(2)(B). The advisory committee notes make clear that "Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct

examination any expert testimony not so disclosed." Id.; see also Johnson v. Vanguard Mfg., Inc., 34 Fed. Appx. 858, 859 (3d Cir. 2002) (upholding a district court's decision to exclude that portion of an expert's testimony which was not included in the expert's report).  Thus, if Mr. Miller were going to opine about market impact, it was his obligation to say so.  See Bonesmo v. The Nemours Found., 253 F. Supp. 2d 801, 810 (D. Del. 2003) (granting summary judgment where plaintiffs' expert's report was incomplete and rejecting the argument that had defendants taken a deposition they would have learned all of the opinions).

Plaintiffs did not do what they needed to do when they needed to do it.  They ought not be pointing a finger of blame at defendants for not having asked even more questions than they did, especially since when they did make that attempt, plaintiffs' counsel objected.

**B.     Mr. Miller's Attempt To Add To His List Of Relevant Disclosures Is Improper.**

Mr. Miller's next inconsistency is equally indefensible.  In his initial report, Mr. Miller claimed that there were just three corrective disclosures, i.e., the so-called "relevant disclosures."  See Miller Rpt. ¶ 14.  Now, having seen defendants' summary judgment motion, he has changed his tune and claims that there are five relevant disclosures -- the three identified in his initial report plus (1) the November 29- December 4, 2000 time period; and (2) December 5, 2000.  See Miller Decl. ¶ 4.

In response to this blatant inconsistency, plaintiffs now suggest that Mr. Miller had put defendants on notice that he may add additional relevant disclosures.  Specifically, they claim that, by referring to the Complaint in paragraph 26 of his initial report, Mr. Miller was free

to add any disclosure mentioned anywhere in the 100-paragraph Complaint.  They also claim
that he had discussed the new disclosures during his deposition.

As discussed above, Mr. Miller was obligated to disclose all of his opinions in
detail.  Fed. R. Civ. P. 26(a)(2)(B).  It is not enough for Mr. Miller to simply reference the
Complaint.  See, e.g., Stein, 2001 WL 936566 at *7 (reference in first report to a 28-page long
document does not "put the Defendants on notice that [the expert] intended to express that
particular opinion at trial").  Rather, if he was going to rely upon five relevant disclosures, he
was obligated to say so unambiguously prior to the expert report deadline.  Given that Mr. Miller
identified three "relevant disclosures" with particularity, defendants had no reason to believe that
additional disclosures were part of his opinion.  And, until defendants moved for summary
judgment, they weren't.

Indeed, while Mr. Miller mentioned the two new items at his deposition, he made
clear that he was not offering opinions about them.  As plaintiffs concede, Mr. Miller testified
that he had "not included" the new events in his analysis.  Pls.' Brf. at 6; see also Miller Dep. Tr.
at 79 ("we haven't done anything further on those [the November 29-December 4 and December
5 events] in terms of reflecting these in a damage analysis or modifying our previous work").
Instead, Mr. Miller testified that he and his team had "settled on the ones [the three relevant
disclosures] that we used initially in our preliminary report."  Id. at 80.[2]  Given this testimony, it
is clear that the new report is contradictory and should be stricken.

---

[2]      Plaintiffs also claim that Mr. Miller put defendants on notice of his new opinion that
Safeguard's stock price on December 5, 2000 suffered a relative decline.  See Pls.' Brf. at
7.  Mr. Miller did no such thing.  See Defs.' Brf. at 18.  Mr. Miller's initial report does
not discuss the issue of relative decline whatsoever.  In addition, Mr. Miller testified at

III.    **MR. MILLER'S OPINIONS FAIL TO STATISFY <u>DAUBERT</u>.**

Finally, as defendants have already established, Mr. Miller's opinions in his new report lack any real substantive or methodological scientific basis. <u>See</u> Defs.' Brf. at 14-20. Specifically, Mr. Miller fails to provide any support for his opinions that:  (1) the allegedly manipulative eMerge trades caused inflation in eMerge's and Safeguard's stock prices; and (2) Safeguard's stock price suffered a relative decline on December 5, 2000.

In response, plaintiffs do not even try to defend Mr. Miller's market manipulation opinion, choosing instead to duck that issue. <u>See</u> Pls.' Brf. at 12. And, with regard the December 5th disclosure, plaintiffs devote their entire <u>Daubert</u> response -- two paragraphs -- to the entirely conclusory assertion that Mr. Miller's so-called "event study" is good enough. <u>See</u> <u>id.</u> Plaintiffs offer no actual defense of Mr. Miller's methodology (of which there was none), and fail to address, let alone distinguish, the cases defendants cited showing that Mr. Miller's new report is facially deficient. Thus, based on <u>Daubert</u> alone, the Court should strike Mr. Miller's new report.

A.    **Not Even Plaintiffs Claim That Mr. Miller's Market Manipulation Opinion Satisfies <u>Daubert</u>.**

Defendants spent nearly two-pages of their brief specifically addressing the failures in Mr. Miller's new market manipulation opinions. <u>See</u> Defs.' Brf. at 15-16. Plaintiffs offered <u>no</u> response. Nor could they. Mr. Miller has never identified the methodology underlying his conclusions, because he has none. He has never disclosed any calculation

___

his deposition that "[w]e have not included in our analysis a relative decline factor. . . ." Miller Dep. Tr. at 223. Thus, Mr. Miller's new report, in which he opines for the first time regarding relative decline, is impermissible.

showing that Safeguard's stock price was manipulated, because there is none.  Thus, Mr. Miller's

speculative opinions cannot stand.  See, e.g., Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir.

2000).

**B.**  **Mr. Miller Failed To Perform a Proper Event Study.**

Mr. Miller's belated attempt to explain away the lack of a negative stock price

movement on December 5th is equally unscientific.  Mr. Miller opined for the first time in his

new report that Safeguard's stock price was "negatively impacted" on December 5th because,

although Safeguard stock went up 16.5% that day, an unidentified "peer group index" went up

more.  See Miller Decl. ¶ 7.  But, as defendants demonstrated in their initial brief, Mr. Miller's

approach of simply comparing Safeguard's stock price to the movement of an index is not a valid

way to control for the market and isolate the impact of the alleged fraud.  As the case law makes

clear, an event study is necessary to identify the impact of the alleged fraud versus the impact of

all other events.  See Defs.' Br. at 16-20.

Plaintiffs do not dispute that they must control for "non-fraud related" influences

on Safeguard's stock price.  Rather, they claim that Mr. Miller did, in fact, perform an event

study.  He did not.  An event study is a term of art in securities cases.  It is a statistical test used

to determine which portion of a stock's price movement is attributable to the alleged fraud versus

non-fraud influences, such as market/industry forces, company-specific information unrelated to

the fraud, or random chance.  See In re World Access, Inc. Sec. Litig., 310 F. Supp.2d 1281,

1298 n. 10 (N.D. Ga. 2004); In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp.2d 1005,

1014 (C.D. Cal. 2003); In re Northern Telecomm. Sec. Litig., 116 F. Supp. 2d 446, 456-57

(S.D.N.Y. 2000).

Mr. Miller's approach falls far short of a true event study.  First, Mr. Miller failed to perform any analysis to determine whether his "peer group index" is actually made up of Safeguard's peers.  As courts recognize, the first step in any event study is to identify an index that actually moves in similar fashion as the company's stock.  See, e.g., In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1348 (N.D. Cal. 1994).  Here, Mr. Miller has simply made the conclusory and factually unsupported assumption that Safeguard's stock price should have *always* moved in *perfect unison* with his "peer group index."  As Judge Van Antwerpen has recognized, this is a "dubious" assumption.  Computer Aid, Inc. v. Hewlett Packard Co., 56 F. Supp.2d 526, 540 (E.D. Pa. 1999) (expert's comparison of company's stock price to index improperly assumed one-to-one correlation and was therefore "lacking in certain important statistical details").

Worse yet, Mr. Miller admitted that he had not performed the necessary work to identify a particular index that was closely correlated to Safeguard's stock price:

> Q.    How much of that decline in Safeguard's stock price was the result of market forces, in your view?
>
> * * *
>
> A.    <u>We haven't attempted to define that in a very precisely quantified way at this point</u>.  We've observed that there are a wide variety of index movement choices that one could make to attempt to answer that question during that time frame, from broad market indexes to a -- an attempted recreation of the company's proxy index to more generally recognized indexes, for example. . . . So it would really depend on an appropriate definition of comparative companies and a useful index, and then an assessment of whether individual stock declines in Safeguard corresponded with those market declines in time or were due to other factors, <u>and that's not an analysis that we've conducted in detail at this time.</u>

Miller Dep. Tr. at 296-98 (emphasis added).  Moreover, Mr. Miller admitted that there are

"issues" with the "quality" of the very index upon which he now, belatedly relies. See id. at 244.

       Compounding this error, Mr. Miller failed to account for the numerous non-fraud-

related factors that could have obviously caused Safeguard's stock price to move.  For instance,

on February 20, 2001 (one of Mr. Miller's alleged "relevant disclosure" dates), it was disclosed

that Safeguard's partner company, Tangram, faced NASDAQ delisting.  Although this

information appears on Mr. Miller's own chronology, he attributes the entire February 20, 2001

stock price decline to the alleged fraud.  As courts recognize, such an approach is improper.  See,

e.g., In re Imperial Credit, 252 F. Supp. 2d at 1014-16 (excluding expert report under Daubert

because it provided no basis for distinguishing between fraud-related and non-fraud related

influences on company's stock price).

       Finally, Mr. Miller failed to determine whether any difference between the

movement of Safeguard's stock price and that of the index was even statistically significant, i.e.,

whether the difference was merely the result of random chance.  Courts recognize that this is a

crucial part of a valid event study.  See, e.g., In re Oracle Sec. Litig., 829 F. Supp. 1176, 1181

(criticizing expert report that did not use "standard measures of statistical significance" and

observing that many of expert's estimates "reflected, not the influence of fraud, but purely

random occurrences"); cf. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1112 n.4 (3d Cir.

1997) (en banc) (attempt to compare number of employees fired by age had "little if any value"

absent "any demonstration of the statistical significance of this data"); Lawton v. Sunoco, Inc.,

No. CIV. A. 01-2784, 2002 WL 1585582, at *10 (E.D. Pa. July 17, 2002) (where plaintiff did not

"attempt to show the statistical significance of his data," the data "loses its possible value").

Plaintiffs admit, as they must, that Mr. Miller did not perform any of these statistical tests. See Pls.' Brf. at 12 n.7.  Nevertheless, they try to confuse the issue by arguing that Mr. Miller was free not to follow any of the usual steps because Safeguard's stock price "moved significantly on some or all of the 'event' days or occasions specified by Mr. Miller." Pls.' Brf. at 12 n. 7.  Plaintiffs' argument is circular.  Safeguard's stock price may have "moved significantly" on certain days, but that does not mean that the stock price movement was caused by fraud.  The whole point of doing an event study is to explain *why* a company's stock price moved the way it did.  Mr. Miller's superficial "analysis" fails entirely to answer that question.

Lastly, plaintiffs fail to cite a single case holding that the back-of-the-envelope comparison that Mr. Miller did here is a proper way to isolate alleged fraud-related and non-fraud related influences.  By contrast, defendants cited three cases -- all of which plaintiffs ignore in their response -- holding that summary judgment for defendants is proper where an expert fails to perform a statistical event study.  See Defs.' Br. at 20 (citing In re Imperial Credit Indus., Inc., Sec. Litig., 252 F. Supp.2d 1005, 1014-16 (C.D. Cal. 2003); In re Northern Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000); Goldkrantz v. Griffin, No. 97 CIV. 9075, 1999 WL 191540, at *4-*5 (S.D.N.Y. Apr. 6, 1999)).  For the same reason, Mr. Miller's report here is deficient and should be stricken.[3]

---

[3]     As defendants argued in their initial summary judgment brief, Mr. Miller's failure to perform a proper event study likewise renders his opinions regarding other alleged corrective disclosures (i.e., the alleged disclosures on December 18, 2000, February 9, 2001, and February 20, 2001) unreliable.  See Defs.' S.J. Brf. at 18-21.

**IV.    DEFENDANTS ARE ENTITLED TO COSTS BECAUSE OF PLAINTIFFS'
WILLFUL AND BAD FAITH ACTS.**

Plaintiffs argue that defendants are not entitled to fees and costs because:  (1)
plaintiffs did not violate an order of this Court; (2) defendants did not comply with their "meet
and confer" obligations under Local Rule 26.1; and (3) plaintiffs did not act in bad faith.
Plaintiffs have no law to support their first two arguments and no facts to justify their third.

Plaintiffs' contention that this Court's Scheduling Orders do "not affirmatively
mandate any particular action by plaintiffs, but merely set the schedules for the completion of
discovery" is plainly wrong.  Pls.' Brf. at 13.  This Court required that plaintiffs serve all expert
reports by March 19, 2004, so that expert discovery could be completed timely and this case
could proceed in an orderly manner to the summary judgment and trial stages as necessary.
Moreover, the Federal Rules provide this Court with the power to enforce all of its orders,
including the Scheduling Orders.  See Fed. R. Civ. P. 16(f) (allowing for sanctions under Rule 37
for violations of a "scheduling or pretrial order"); Fed. R. Civ. P. 37 (allowing for an award of
costs and attorneys' fees).  Had plaintiffs required additional time for expert discovery, they were
obligated to petition the Court for leave to do so.  Plaintiffs' conduct not only violated the
Court's Order, it demonstrates bad faith.

Plaintiffs fault defendants for failing to meet and confer with them prior to filing
the motion.  Plaintiffs cite no case law holding that defendants had such an obligation; nor could
they.  This is not a discovery dispute.  One side is not withholding documents, failing to answer
interrogatories, avoiding depositions, or otherwise taking actions that may be resolved through
discussions between the parties.  Rather, plaintiffs violated the Court's Scheduling Orders

18

through the submission of an untimely and contradictory expert report.  There was no requirement that defendants meet and confer with plaintiffs.

       Lastly, plaintiffs contend that they did not act in bad faith.  Plaintiffs, however, still offer no justification for filing Mr. Miller's late report.  They do not, for instance, identify any mistakes in Mr. Miller's initial report that needed to be corrected.  Nor do they claim that Mr. Miller is relying upon information that became available only recently.  Thus, there is simply no reason why plaintiffs' sandbagging should be permitted.  Accordingly, an award of costs is proper.  Aveka L.L.C., 212 F.R.D. at 312.

## CONCLUSION

For the reasons set forth above and more fully in defendants' opening brief, Defendants' Joint Motion To Strike and Preclude Testimony of Plaintiffs' Expert, R. Alan Miller, and For Costs should be granted.

Dated:  October 13, 2004

Respectfully submitted,

s/ Steven B. Feirson                                s/ H. Robert Fiebach
Steven B. Feirson                                   H. Robert Fiebach
Michael S. Doluisio                                 John P. Quinn
Stuart T. Steinberg                                 COZEN O'CONNOR
Rick Swedloff                                       1900 Market Street
DECHERT LLP                                         Philadelphia, PA 19103
4000 Bell Atlantic Tower                            215-665-6953
1717 Arch Street
Philadelphia, PA  19103-2973
(215) 994-4000                                      Attorneys for Warren V. Musser

William K. Dodds
DECHERT LLP
30 Rockefeller Plaza
New York, NY  10112
(212) 698-3500

Attorneys for Safeguard Scientifics, Inc.

## CERTIFICATE OF SERVICE

I, Stuart T. Steinberg, hereby certify that on October 13, 2004, I filed

electronically the foregoing Reply Memorandum of Law in Support of Defendants' Joint Motion

To Strike and Preclude Testimony of Plaintiffs' Expert, R. Alan Miller, and for Costs.  I further

certify that I caused a true and correct copy of the foregoing document to be served on counsel as

follows:

VIA HAND DELIVERY
Todd S. Collins, Esquire
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103

VIA FAX & FIRST CLASS MAIL
Donald B. Lewis, Esquire
Law Offices of Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

VIA FIRST CLASS MAIL
Curtis V. Trinko, Esquire
Law Offices of Curtis V. Trinko LLP
16 West 46th Street, Seventh Floor
New York, NY  10036

VIA FIRST CLASS MAIL
Daniel A. Osborn, Esquire
BEATIE & OSBORN LLP
5210 Fifth Avenue, 34th Floor
New York, NY  10175

VIA FIRST CLASS MAIL
Allan H. Gordon, Esquire
KOLSBY, GORDON, ROBIN & SHORE
One Liberty Place, 22nd Floor
Philadelphia, PA  19103

VIA HAND DELIVERY
H. Robert Fiebach, Esquire
John P. Quinn, Esquire
COZEN & O'CONNOR
1900 Market Street
Philadelphia, PA  19103

s/ Stuart T. Steinberg_____
Stuart T. Steinberg

Date:  October 13, 2004